UNITED STATES *v.* GRAHAM & ZENGER, INC., ET AL.

No. 4662.—Invoices dated Frauenau, Germany, January 19, 1934, etc.
    Certified January 23, 1934, etc.
    Entered at New York February 5, 1934, etc.
    Entry No. 47012, etc.

Second Division, Appellate Term

(Decided October 23, 1939)

*Webster J. Oliver*, Assistant Attorney General (*Dorothy C. Bennett*, special attorney), for the appellant.
*Daniel P. McDonald*, for the appellees.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: This is an application for a review of a decision rendered July 18, 1938 by Sullivan, Judge (Reap. Dec. 4368), wherein he held that the unit invoice values, plus cost of cases and packing, of certain blown glass tableware imported from Germany and entered at the port of New York between January, 1934, and July, 1937, constituted the correct export and dutiable values of said merchandise.

At the hearing before the trial judge the importer offered in evidence the testimony of Fred A. Schabmayr who testified that since 1912 he had been employed by Graham & Zenger, Inc., and Black Knight China, Inc., the two importers herein; that since then he has been continuously in the United States; that previous to that time he had lived in Germany and had studied English in the schools there; and that since 1912 he has frequently translated documents from the German into the English language, and *vice versa*.

At this juncture, counsel for the importers offered in evidence the affidavit of J. Gistl, owner of the Krystallglasfabrik at Frauenau, Germany, the exporter of the merchandise herein, which, together with the English translation thereof made by the witness was admitted in evidence herein as Collective Exhibit 1, over objection of Government counsel.

The witness then proceeded to testify that from 1930 to February 1936 he was general manager and treasurer of Graham & Zenger, Inc.; that during that period he supervised the purchasing of the merchandise covered by the appeals to reappraisement herein; that in so doing he made many trips to Germany; that since February 1, 1936, he has been general manager and treasurer of the Black Knight China, Inc.; that in that capacity he supervised the purchasing of the merchandise covered by the present reappraisement appeals filed by

the latter corporation; that the relationship between the Krystall-glasfabrik at Frauenau, the manufacturer and exporter of the merchandise herein, on the one hand, and Graham & Zenger, Inc., and Black Knight China, Inc., the importers herein, on the other hand, was that of sellers and buyers of the merchandise in question; that the prices paid for all of said merchandise were the invoice prices; and that there was no exclusive selling or buying agreement between said exporter and importers herein.

On cross-examination the witness testified as follows:

X Q. Mr. Schabmayr, the merchandise involved in these importations, was that glassware an exclusive pattern reserved for your Company?—A. No.

X Q. Or an exclusive design?—A. No; they are not.

X Q. Do you have any exclusive rights with respect to that glassware, that particular type of glassware?—A. No; we have not.

X Q. Were you in Germany in 1934?—A. 1934. No; I was in Germany in 1935, last.

X Q. At what time of the year were you in Germany?—A. In the months of May and June.

X Q. Were you in Germany in 1936?—A. No.

X Q. Were you in Germany in 1937?—A. No.

In the affidavit admitted in evidence as Collective Exhibit 1 which, together with the witness Schabmayr's testimony, is the only evidence offered by the importers, the affiant states that from January 1, 1934, to December 6, 1937, he was the owner of the Krystall-glasfabrik at Frauenau; that during said period he supervised all sales of blown glass tableware sold by his company both for domestic consumption in Germany and for export to the United States and other countries, with the exception of the period between November 14, 1934, and February 18, 1935, during which he was ill but was nevertheless kept informed by reports regarding the current business; that during all this time his company sold blown glass tableware in wholesale quantities for domestic consumption in Germany without any restriction to all purchasers, said blown glass tableware being the same as *some* of the blown glass tableware which was sold by his company to Graham & Zenger, Inc., and the Black Knight China, Inc., both of New York, the importers herein; that the following are the net prices f. o. b. plant, packing included, of blown glass tableware similar to that sold by his company for export to the importers herein:

| | | | |
|---|---|---|---|
| Ant/1 | Roemer antikgreen, plain | RM | —. 45. 3 |
| 530/R | Roemer corner optic, cut stem | | —. 37 |
| 822/2 | Claret Glasses, special crystal, cut | | —. 57. 7 |
| 822/4 | Wine Glasses, special crystal, cut | | —. 56 |
| 822/7 | Champagne Glasses, special crystal, cut | | —. 70 |
| 822/10 | Tumblers, special crystal, cut | | —. 51. 1 |
| 732/6a | Cordial Glasses, lead crystal, cutting | | —. 46. 4 |
| 732/4 | Sherry Glasses, lead crystal, cutting | | —. 46. 4 |
| 732/2 | Claret Glasses, lead crystal, cutting | | —. 51 |

(Paper cut-outs of the said nine items are attached to the affidavit, Collective Exhibit 1); that the usual wholesale quantity of blown glass tableware similar to that sold to the importers herein by affiant's company for export to the United States from January 1, 1934, to December 6, 1937, varied from 24 to 300 pieces of each number.

As the trial judge points out in his opinion the first two of the above items appear in reappraisement No. 112210–A, the prices in said invoice being .50 RM instead of .45.3 and .38 RM instead of .37 RM. None of the other invoices in the reappraisements herein contains any of the above 9 items.

The affiant further states that the principal market in Germany for the sale of blown glass tableware similar to the merchandise herein both for home consumption and for export to the United States is Frauenau, Bavaria; that the relationship between his company and the importers herein was that of seller and buyers; that his company would have sold similar blown glass tableware during the period from January 1, 1934, to December 6, 1937, to all purchasers for export to the United States at prices corresponding to the prices at which similar blown glass tableware was sold to the importers herein.

Attached to the affidavit (Collective Exhibit 1) are copies of invoices of sales, but as the trial judge points out only a few of the items listed appear on the invoices covered by the reappraisements herein. The prices of those which appear to correspond in item numbers to those of the same number on the invoices attached to the affidavit are slightly lower than those shown on the invoices at bar. From this it would appear that as to some of the items the foreign value is less than the export value.

The Government offered in evidence three reports of Treasury representatives which were admitted in evidence as Exhibits 2, 3, and 4, respectively. In the first of these (Exhibit 2), dated May 5, 1934, the Treasury representative Walter M. Wolff states that on March 12, 1934, he visited the offices of the National German Hollow Glass Manufacturers' Association at Dresden, Germany, and interviewed its general manager, Dr. W. Schmidt, and appended to his report lists showing prices and other information which "are valid only for the German home market." The report also states that *"All quotations are considered confidential for the use of cartel members (manufacturers) only. The latter may ask higher prices than those fixed and controlled by the cartel but they may not sell at lower figures."* [Italics ours.]

The report further states that "With the formation of the national cartel, however, the various branch trade groups were obliged to issue instructions and regulations which are binding upon all members who offer or sell merchandise for home consumption. Under date of February 15, 1934, legislation was passed in Germany providing for the compulsory union of the entire hollow glass industry, which law

is to remain in effect until December 31, 1935, unless abolished by the Federal Minister of Economy prior to that time."

As stated by the trial judge, the annexed price lists do not contain the trade names and the item numbers appearing on the invoices involved herein, nor has the defendant's counsel pointed out to the court any method by which said items can be identified.

In the second report (Exhibit 3), dated December 3, 1934, Treasury Representative John P. Griebel states that on November 22, 1934, he visited the factory of Krystallglasfabrik at Frauenau, Germany, and obtained his information from the books and records of the concern and from Alfred Gistl, the manager.

Under the heading "Export Value" appears the following:

*Relationship:*
The glass stemware is freely offered to all purchasers for export to the United States. The relationship is that of purchaser and seller only. In some cases the purchaser furnishes his own designs for some of the articles and these are reserved for him and not offered for sale to others.

*Prices:*
·There is no price list published for export. Each order is calculated and prices quoted and these will vary according to the kind of glass and the designs or decorations.

The prices are ex-works. The cost of packing, labor and material, is charged extra at the rate of 5% of the invoice value.

The cases are charged extra at their cost and this varies with the size.

There is a cash discount of 3% allowed for payment within 14 days.

As to orders placed by the importers herein during the latter part of 1933 and the early part of 1934, the Treasury representative states that "Consular Invoices #1030 (Reappraisement 112578–A) and 2673 (Reappraisement 112213–A) certified at Hamburg February 27 and May 24, 1934, respectively are further shipments. The prices and the office records agree.

Under the heading "Sales to Others" occurs the following: "There were no sales of similar or identical glassware to others for export to the United States this year according to Mr. Gistl."

Under the heading "Foreign Value" the author of the report states:.

Stem glassware is freely offered to all purchasers in the German market. These are mostly standard lines. According to Mr. Gistl over 50% of their business is with wholesale dealers.

\*     \*     \*     \*     \*     \*     \*

The following discounts are allowed:

| | |
|---|---|
| To large wholesalers | up to 20% |
| Other wholesalers | 15% |
| Department stores and similar concerns | 10% |
| Small purchasers | 5% |

A cash discount of 2% is allowed for payment within 30 days.
The prices are ex-works.

\*     \*     \*     \*     \*     \*     \*

There is a turn-over or home-consumption tax of 2% on all sales in the German market. The manufacturer must pay this out of his selling price; it cannot be charged extra. *It is not paid on exports.* [Italics ours.]

Under the heading "Sales in the German Market" occurs the following:

Mr. Gistl stated that they have several thousand designs and that the taste in each country differs, designs which sell well in one country have no demand in others. Consequently it would be practically impossible to find sales in the German market of similar merchandise. Such sales as were noted were at the list prices less the regular association discounts and ex-works, packing and cases charged extra.

Under the heading "Specific Information" occurs the following:

\* \* \* \* \* \* \*

(2) The relationship between the importer and manufacturer is simply that of purchaser and seller.

\* \* \* \* \* \* \*

(4) *Most of the articles sold to Graham & Zenger are especially made for them and according to their own designs; they are reserved and will not be sold to others. This refers to the design or cutting; it applies to all cut glass.* [Italics ours.]

The Treasury representative then refers to certain cut stemmed glasses covered by invoice item No. 3985. That item appears on the invoices in reappraisements 112211–A, 112578–A, 112579–A, 112580–A, 112695–A, 112822–A, 112841–A, 113144–A, 113526–A, and 114637–A, in all of which cases the appraised value exceeds the invoice value about 20 percent.

As to said item 3985 the Treasury representative states that "Mr. Gistl has shown the prices to Graham & Zenger on the sketch and has stated, in writing, that *if* he sold these in Germany he would add 20% to these prices. [Italics ours.]

The "writing" referred to in the above statement is a letter from Gistl to the Treasury representative, dated July 7, 1934, the pertinent portions of which are as follows:

\* \* \* There are enclosed herewith a few sketches showing the stemware shipped to Graham & Zenger, New York. The prices marked in ink denote those which Graham & Zenger were paying. The prices marked in pencil at each glass are those which we obtained in Germany for the merchandise. The stemware which we ship to America is up to 22% lower in price than that sold in Germany. Other assortments are shipped to America at the same prices as obtained in Germany. We accept such prices for shipments to America as we can get. Enclosed herewith are sketches of Set 3985. The prices marked on the sketches are those at which we shipped the merchandise to America. The German prices are 20% higher. We are prepared to sell to America at prices 22% lower than those obtained in Germany. This percentage does not apply to Graham only, we would sell at the same price to other firms outside of Germany. The Hapsburg service is reserved for Graham. The cognac coolers 12/108 and 12/1004 are likewise made for Graham only.

The report purports to give the following explanation by Mr. Gistl for the lower prices to the United States on some of the glassware:

The prices of some of the designs in cut glassware are higher than the importers can pay and compete with world market prices. The factory therefore bargains for the best prices obtainable in order to make the sale. This applies to all purchasers in the United States and other countries. The amount is not fixed only they *will not go lower* than 22% below German prices. Against this they are able to obtain better prices for some lines to offset these so that they average the usual profit of 5 to 7%. This percentage was given by several manufacturers as the usual profit in this line of business.

In the third report (Exhibit 4) dated August 20, 1935, Treasury Representative Walter M. Wolff, the author thereof, states on page 5:

Inasmuch as nearly all of the table glassware shipped to Messrs. Graham & Zenger, Inc., New York, is specially made to order for the latter, it is exceedingly difficult to find evidence of such or similar merchandise having been offered or sold to dealers in the German home market, by informant stated. Another difficulty is also to be found in the fact that three distinct kinds or qualities of cut glass (Krystall) are produced by the manufacturer at Frauenau. * * *

1. *Ordinary Potash Glass:*. Sold both inland and for export.

2. *Special Lead Crystal:* Sold chiefly for exportation, claimed.

3. *Full Lead Crystal:* Not yet sold for export to U. S. A.

As already discussed in much detail under earlier Berlin reports covering the subject of table glassware, there are innumerable designs and etching, engraving or cutting-styles. Each service has its own price depending largely upon the intricacy of execution and quality of glass desired. For export to the United States and other foreign markets, services are almost invariably made to the importer's specifications and although some comparison between this class of merchandise and that produced for home consumption might be possible, same would nevertheless be quite accidental, Mr. Gistl said.

* * * In view of the fact that Messrs. Graham & Zenger, Inc. order many innovations in goblets and other service units, the quotations shown under the Association list can rarely be used in determining the American concern's prices as mentioned under the various consular invoices alluded to by the Appraiser. Only in sporadic instances may a comparison between the export quotations and the Association prices (Exhibit "A" of the earlier report) be made, * * *.

As the trial judge, in commenting on the evidence, aptly said:

* * * This indicates that most of plaintiffs' glassware is not sold in the German market, and that it was largely guesswork on the part of the appraiser in determining that the home market of "such or similar merchandise" should be about 20 per centum higher than the invoice prices of plaintiffs' merchandise, for the reason that the Association's price-list "can rarely be used" in determining whether or not plaintiffs' prices as stated on the consular invoices are correct. It would seem that "such or similar merchandise" to plaintiffs' glassware, is *not* "freely offered for sale to all purchasers in the principal markets of the country from which exported (Frauenau)."

The report then goes on to compare the invoice prices of certain items with the minimum Association list prices, and we agree with the trial court's finding that, taking into account the usual trade discount, there is practically no difference between the two.

The report then states that—

Virtually all other items mentioned on the foregoing and subsequent consular invoices are specialties made to order for Graham & Zenger, Inc. The manufacturer is not obliged to adhere strictly to Association-approved calculations when quoting prices for export assortments, *but Mr. Gistl claimed that his export prices are figured on very nearly the same basis as established by the Association for the inland market.* [Italics ours.]

Referring to the so-called "Strohglas" glasses on consular invoice No. 5796 which are not offered or sold in Germany in the regular course of trade, the report adds—

\* \* \* but the quotations made to Graham & Zenger, Inc., are based on cost figures which vary only slightly from those which would apply if the goods had been made for resale in the domestic market.

It also appears from the report that the ordinary wholesale dealer in Germany is entitled to receive 15 per centum discount, and that a few large wholesalers are allowed 20 per centum discount, whereas in the reappraisements at bar no discounts are claimed by the importers.

Originally there were annexed and made part of this report (Exhibit 4) certain documents in the German language which were designated as Exhibits A and B but which were not attached to said report when the latter was offered in evidence at the trial. Subsequently, defendant moved to set aside the submission for the purpose of introducing in evidence said Exhibits "A" and "B." Said motion, however, was denied. However, inasmuch as they are in the German language they were not admitted at the trial and have not since been admitted, and therefore may not be considered in determining the issues involved herein.

In our opinion counsel for the importers are justified in commenting adversely upon the fact that the Government did not cause a translation to be made of said documents, or of a certain price list and catalog referred to in Government's Exhibit 3 and certain portions of Exhibit 2. As a matter of law all of that portion of Government Exhibits which are admitted in evidence and which are in the German language and untranslated, are plainly inadmissible as evidence. *Jose A. Montemayor e Hijos et al.* v. *United States*, 24 C. C. P. A. 7, T. D. 48288.

Upon the entire record we find—

1. That the merchandise at bar consists of blown-glass tableware of various shapes and designs.

2. That the principal market in Germany, the country of exportation, for the sale of such merchandise for export to the United States, is Frauenau, Bavaria.

3. That the usual wholesale quantities consist of from 24 to 300 pieces of each item number.

4. That at the time of exportation of said merchandise with two possible exceptions such or similar merchandise was not freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade for home consumption in Germany, or for export to countries other than the United States.

5. That even if two of said item numbers in the invoices herein were similar to corresponding designs or shapes of blown-glass tableware sold in Germany for home consumption, nevertheless the prices at which they were sold were lower than the export values thereof.

6. That therefore there was no foreign value higher than the export value for such or similar merchandise at the time of the exportation herein.

7. That while it is true that the designs of the imported glassware were specially ordered and made for the importers herein, nevertheless they were freely offered for sale to all purchasers for exportation to the United States.

8. That there was an export and therefore a dutiable value for said merchandise, which value is represented by the unit invoice prices herein, plus cases and packing as invoiced, as found by the trial judge, whose decision is hereby affirmed.

Judgment will be rendered accordingly.